# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| J.T., an individual,<br><br>        **Plaintiff,**<br><br>        v.<br><br>CHOICE HOTELS INTERNATIONAL, INC.;<br><br>WYNDHAM HOTEL & RESORTS, INC.; WYNDHAM WORLDWIDE; WYNDHAM HOTEL GROUP, LLC; RAMADA BY WYNDHAM;<br><br>G6 HOSPITALITY, LLC; G6 HOSPITALITY FRANCHISING, LLC;<br><br>SIX CONTINENTS HOTELS INC.; HOLIDAY HOSPITALITY FRANCHISING, LLC;<br><br>RED ROOF INNS, INC.; AND RED ROOF FRANCHISING, LLC.<br><br>        **Defendants.** | **Case No.**<br><br>**JUDGE** _____<br>**Related Case: No. 19-cv-849**<br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT

COMES NOW, the Plaintiff J.T. ("Plaintiff" or "J.T."), by and through her undersigned counsel, and respectfully submits her complaint for damages and makes the following averments, all upon information and belief.

## INTRODUCTION

1.  Plaintiff J.T. is a survivor of human sex trafficking who was trafficked from June 2015, when she was 16 years old until a few months after her 18th birthday, approximately fall 2016.

1

2. J.T. met one of her traffickers at a friend's Sweet 16 birthday party in 2015. She was kidnapped by the traffickers within a week after the party in 2015, when she was 16 years old, and forced into sex trafficking, being sold for sex in Defendants' hotel and motel rooms.

3. J.T.'s kidnapper and one of her traffickers is a member of an infamous New York Gang.

4. J.T. was the subject of two missing person hunts from the National Center for Missing and Exploited Children, where her photo was published and circulated via television news and other media.

5. J.T. was posted for sale on websites from Defendants' hotel and motel rooms on Wi-Fi networks that are maintained and monitored by Defendants.

6. Ultimately six (6) of J.T.'s traffickers were convicted of sex trafficking of minors in the Federal District Court of the Southern District of New York, but not before J.T. was forced to consume drugs and alcohol and to endure violence, trauma, exploitation, manipulation, threats, isolation, humiliation, and degradation in Defendants' hotel and motel rooms.

7. J.T.'s traffickers rented hotel and motel rooms at Defendants' properties for one purpose—a location to engage in sex trafficking.

8. J.T. was trafficked while she was a minor at each property named in this Complaint.

9. J.T.'s traffickers forced her onto Defendants' branded properties named below where she was repeatedly raped and forced to perform commercial sex acts with "buyers" and "johns" under threats of physical and psychological abuse and threats to harm her and her family.

10. It was obvious to anyone at Defendants' properties that J.T. was a child being forced to sell her body for sex. Each Defendant knew or should have known that it was profiting from J.T.'s sex trafficking through each Defendant's monitoring of its properties, its general

2

knowledge of sex trafficking in the hotel industry, and its specific knowledge of the prevalence of sex trafficking at its branded properties throughout the United States.

11. At some point, J.T. was able to escape the grasps of her trafficker and the prison of Defendants' hotel and motel rooms.

12. J.T. brings this lawsuit to hold accountable Defendants who continued to profit from her obvious trafficking, facilitating it and harboring it, for their role in her trafficking.

## **OVERVIEW OF TRAFFICKING**

13. It has been known in the hospitality industry since before J.T. was trafficked that a significant portion of all sex trafficking in the United States of America occurs within the hospitality industry at hotels and motels.

14. For decades, sex traffickers have brazenly operated in and out of hotels throughout this country. Traffickers paraded throughout hotels, while hospitality giants stood on the sidelines and did nothing. Instead, hotels and motels paid only lip service to campaigns against sex trafficking and stood by collecting millions in profits from their trafficking occurring on their properties.

15. Defendants knew and have known for decades that they profit from sex trafficking repeatedly occurring under their brand flags.

16. Rather than taking timely and effective measures to stop profiting from this epidemic, Defendants choose to ignore the open and obvious presence of sex trafficking on their branded properties, benefitting from the profit and fees created by rooms rented and Wi-Fi provided for this explicit and apparent purpose.

3

17.      The sex trafficking industry alone pulls in an estimated $99 billion each year, making it the second largest illicit trade after the sale of all illegal drugs.[1] However, traffickers are not the only profiteers. The hotel industry, including Defendants, makes millions from participating in ventures that they know or should have known engage in violations of 18 U.S.C. § 1591(a) through renting rooms where sex trafficking victims are harbored night after night and providing Wi-Fi that traffickers use to advertise and solicit victims for commercial sex acts. Defendants and traffickers have a mutually beneficial relationship, fueled by the sexual exploitation of victims, including J.T..

18.      Defendants and other members of the hospitality industry are and have long been aware of the prevalence of human trafficking, particularly sex trafficking, at hotels in general and at the Defendants' own properties. Defendants and others in the industry have access to much public information on the prevalence of human trafficking at hotels, including reports by, among others, the Polaris Project created for the use of the hospitality industry.

19.      The hospitality industry, speaking through industry organizations, has in recent years been increasingly vocal about its supposed "unified commitment" to combat human trafficking. Unfortunately, the near-total lack of concrete action by Defendants and the rest of the hospitality industry shows that the industry in fact has a "unified commitment" to the very opposite: continuing with business as usual, so that Defendants and all industry participants continue to profit millions from participating in a venture in violation of § 1591(a).

20.      Defendants' decision to prioritize profits over protecting sex trafficking victims resulted in the repeated sexual exploitation and rape of J.T. on their properties.

---

[1] *Profits and Poverty: The Economics of Forced Labor,* INTERNATIONAL LABOR ORGANIZATION (2017), https://www.ilo.org/global/topics/forced-labour/statistics/lang--en/index.htm.

21.     J.T., a survivor of sex trafficking, brings this action for damages against Defendants pursuant to the Trafficking Victim Protection Reauthorization Act, 18 U.S.C. § 1595 and Child Abuse Victim's Rights Act, 18 U.S.C. § 2255. Each Defendant, knowingly benefitted from participation in a venture that it knew or should have known to be engaging in violations of 18 U.S.C. § 1591(a).

**PARTIES**

22.     Plaintiff J.T. is a natural person and a resident and citizen of Union, New Jersey.

23.     Plaintiff is a victim of trafficking pursuant to 22. U.S.C. § 7102(17) and 18 U.S.C. § 1591(a), and a victim of a "severe form of trafficking" as defined under 22 U.S.C. § 7102(16).

a. Due to the sensitive and intimate nature of the issues, Plaintiff J.T. requests that this Court grant a protective order pursuant to Fed. R. Civ. P. 26(c) to permit her to proceed under a pseudonym and to ensure that Defendants maintain the confidentiality of Plaintiff's identity throughout the pendency of this lawsuit and after.[2]

b. Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[3] However, there are exceptions when the issues involved are of a sensitive and highly personal nature.[4] For good cause, the Court may issue

---

[2] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

[3] Fed. R. Civ. P. 10(a).

[4] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See, e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir.); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

an order to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense.[5]

   c.  Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Plaintiff fears the stigma from her family, friends, employer, and community if her true identity is revealed in the public record.

   d.  Plaintiff should not be compelled to disclose her identity in order to maintain her privacy and safety. Plaintiff's privacy interest substantially outweighs the customary practice of judicial openness.[6]

   e.  Moreover, Defendants will not be prejudiced. Plaintiff will agree to reveal her identity to Defendants for the limited purpose of investigating Plaintiff's claims once the parties have entered into a protective order. Plaintiff simply seeks redaction of Plaintiff's personal identifying information from the public docket and assurances that Defendants will not use or publish Plaintiff's identity in a manner that will compromise her safety, personal life, personal relationships, or future employment prospects.

24.    **Defendant Choice Hotels International, Inc.** ("Choice") is one of the largest hotel franchisors in the world and offers its brand public lodging services through its affiliates, subsidiaries, and franchisees.  It is a Delaware corporation with its headquarters in Rockville, Queens and can be served through its registered agent, United States Corporation Company, at 3366 Riverside Dr. Suite 103 Upper Arlington, Ohio 43221.

---

[5] Fed. R. Civ. P. 26(c).
[6] *Does I thru XXIII, 214 F.3d* at 1068 (joining its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

25.    Choice owns, supervises, manages, controls, and/or operates the Rodeway Inn located at 136-05 Cranston St, Queens, New York 11434 ("Choice's Rodeway Inn" and/or "branded property") where J.T. was trafficked for sex from approximately June 2015 through September 2015.

  a. Choice's Rodeway Inn is a Choice brand property.[7]

  b. Choice employees work throughout Choice's Rodeway Inn. Choice employees work jobs including front desk and housekeeping. Choice is the principal with control over nearly every element of operations at Choice's Rodeway Inn. Choice is liable, either directly, vicariously, or indirectly through an agency relationship for the acts and/or omissions of the employees at its branded hotels, including Choice's Rodeway Inn where J.T. was trafficked.[8] Choice has an actual and apparent agency relationship with the physical property owner of Choice's Rodeway Inn as to establish vicarious liability.

  c. Choice controlled and dictated the actions and inactions of Choice's Rodeway Inn through highly specific and detailed brand standards, policies, and procedures.

  d. Choice knowingly benefited, or received something of value, from its commercial business ventures at Choice's Rodeway Inn through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where J.T. was trafficked, as well as in maintaining a positive public image for the Choice brand.

---

[7] *Our Brands*, CHOICE HOTELS, https://www.choicehotels.com/about/brands (last visited Jun. 9, 26 2022).
[8] See, e.g., *Revenue Management*, RED ROOF, https://www.redrooffranchising.com/revenue- management (last visited Jun. 9, 2022) (proclaiming "Our Team is an Extension of Yours").

Choice also benefited from gathering personal data from the Wi-Fi it provided and monitored to customers including J.T. and her trafficker.

e. Choice is subject to the jurisdiction of this Court because it regularly conducts business in Ohio, including through the operation of numerous hotels in Ohio, contracting to supply services in Ohio. Choice has derived substantial revenue from services rendered in Ohio.

f. Whenever reference is made in this Complaint to any act, deed, or conduct of Red Roof, the allegation is that Choice engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Choice.

26. **Defendant Wyndham Hotel & Resorts, Inc.** ("Wyndham Corporate") is a large hotel brand with nearly 9,000 branded properties worldwide. Wyndham Corporate is a Delaware for profit corporation with its principal place of business in Parsippany, New Jersey. Wyndham Corporate maintains a registered agent, Corporate Creations Network, Inc., at 119 E. Court Street, Cincinnati, Ohio 45202, through which it can be served.

27. Wyndham Corporate is the successor entity to **Defendant Wyndham Worldwide Corporation** ("Wyndham Worldwide") retains successor liability for the wrongful acts of its predecessor. Wyndham Corporate's 10k from 2022 states filing with the Securities and Exchange Commission ("SEC") in 2022

> We are one of the world's largest hospitality companies, offering travelers a wide range of hospitality services and products through our global portfolio of world-renowned brands. The hospitality industry is a major component of the travel industry, which is one of the largest retail industry segments of the global economy. Our portfolio of brands have a significant presence in many major hospitality markets in the United States and throughout the world and are uniquely positioned

to provide travelers access to a large assortment of travel accommodations and destinations.

Our brands include: Wyndham Hotels and Resorts, Ramada, Days Inn, Super 8, Howard Johnson, Wingate by Wyndham, Microtel Inns & Suites by Wyndham, TRYP by Wyndham, Dolce Hotels and Resorts, RCI, Landal GreenParks, Novasol, Hoseasons, cottages.com, James Villa Holidays, Wyndham Vacation Rentals, Wyndham Vacation Resorts, Shell Vacations Club and WorldMark by Wyndham

28. Defendant Wyndham Corporate's 10K filing with the SEC in 2025 states that Wyndham Corporate was spun off from Wyndham Worldwide, now known as Travel + Leisure Co., which was the former parent:

Our business was initially incorporated as Hospitality Franchise Systems, Inc. in 1990 to acquire the Howard Johnson brand and the franchise rights to the Ramada brand in the United States. It was an integral part of Wyndham Worldwide Corporation and its predecessor from 1997 to 2018. Wyndham Hotels became an independent, public company in May 2018 when it was spun-off from Wyndham Worldwide, now known as Travel + Leisure Co. ("Travel + Leisure").



29. Wyndham Corporate maintains a registered agent in Ohio, and it can be served through its registered agent, Corporate Creations Network, Inc., at 119 E. Court Street, Cincinnati, Ohio 45202.

30. **<u>Defendant Wyndham Hotel Group, LLC</u>** ("Wyndham Hotel Group"), upon information and belief, is a for-profit Delaware company with its principal place of business in Parsippany, New Jersey. Upon information and belief, Wyndham Hotel Group, LLC is a wholly owned subsidiary of Wyndham Hotels & Resorts, Inc. and a former subsidiary of Wyndham Worldwide Corporation. Wyndham Hotel Group may be served through its registered agent for service, Corporate Creations Network, Inc - 4000 Eagle Point Corporate Drive, Birmingham, AL 35242

31. **<u>Defendant Ramada by Wyndham</u>** ("Ramada by Wyndham") is a large American multinational hotel chain owned by Wyndham. As of December 31, 2022, it operates 851 hotels with 120,344 rooms across 63 countries under the Ramada by Wyndham brand.[9] Ramada by Wyndham, upon information and belief, is a for-profit Delaware company with its principal place of business in Parsippany, New Jersey. Upon information and belief, Ramada is a direct subsidiary of Wyndham Hotel Group, an indirect subsidiary of Wyndham Corporate, and a former subsidiary of Wyndham Worldwide Corporation and may be served through its registered agent for service, Sarah Clemens, 5901 W Century Blvd., Los Angeles, CA.

32. Wyndham Corporate, Wyndham Hotel Group, and Ramada by Wyndham are referred to collectively as the "Wyndham Defendants."

---

[9] Wyndham Hotels 10-5. chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://investor.wyndhamhotels.com/financial-information/all-sec-filings/content/0001722684-23-000005/0001722684-23-000005.pdf

33. Upon information and belief, Wyndham owned, supervised, managed, controlled, and/or operated: the Ramada by Wyndham located at 1000 Sunrise Hwy, Rockville Centre, New York 11570 ("Wyndham's Rockville Ramada" and/or "branded property") where J.T. was trafficked while she was a minor from approximately the beginning of June 2016 through August 2016.

    a. Wyndham's Rockville Ramada is a Wyndham brand property.[10]

    b. Wyndham employees worked throughout Wyndham's Rockville Ramada Wyndham employees worked jobs including front desk and housekeeping. Wyndham is the principal with control over nearly every element of operations at Wyndham's Rockville Ramada. The Wyndham Defendants are liable, either directly, vicariously, or indirectly through an agency relationship for acts and/or omissions of the employees at its branded hotels, including Wyndham's Rockville Ramada where J.T. was trafficked. The Wyndham Defendants have an actual and apparent agency relationship with the physical property owners of Wyndham's Rockville Ramada as to establish vicarious liability.

    c. The Wyndham Defendants controlled and dictated the actions and inactions of Wyndham's Rockville Ramada through highly specific and detailed brand standards, policies, and procedures.

    d. The Wyndham Defendants knowingly benefited, or received something of value, from its ventures at Wyndham's Rockville Ramada through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where J.T. was trafficked, as

---

[10] *Our Brands,* Wyndham Hotels, https://www.wyndhamhotels.com/wyndham-rewards/our-brands (last visited September 27, 2022).

well as in maintaining a positive public image for Wyndham's Rockville Ramada. Wyndham also benefited from gathering personal data from the Wi-Fi it provided to customers including J.T. and her trafficker.

e. The Wyndham Defendants are subject to the jurisdiction of this Court because they regularly conduct business in Ohio, including through the operation of numerous hotels in Ohio, contracting to supply services in Ohio. The Wyndham Defendants have derived substantial revenue from services rendered in Ohio.

f. Whenever reference is made in this Complaint to any act, deed, or conduct of Wyndham, the allegation is that the Wyndham Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Wyndham.

34. **Defendant Red Roof Inns, Inc.** ("Red Roof Inns"). is a publicly traded company. The company provides franchise opportunities for its hotel and motel brands through **Defendant Red Roof Franchising, LLC**, ("Red Roof Franchising") (together Red Roof Inns and Red Roof Franchising will be referred to as "Red Roof").[11] Red Roof purchases, owns, and manages a network of hotels and motels globally, primarily in the Midwest, Southern, and Eastern United States. Red Roof serves customers throughout the United States and other countries throughout the World.

---

[11] Upon information and belief, Red Roof Franchising, LLC is a wholly owned subsidiary of Red Roof Inns, Inc. and serves as Red Roof Inns, Inc.'s franchising arm.

35.     Red Roof is a global hotel brand with approximately 650 branded properties worldwide. It is a Delaware corporation, with its corporate headquarters and principal place of business at 7815 Walton Pkwy, New Albany, Ohio 43054.

36.     Red Roof maintains a registered agent in Ohio, and it can be served through its registered agent, Corporation Service Company, at 3366 Riverside Dr. Suite 103 Upper Arlington, Ohio 43221.

37.     Red Roof Franchising was named one of the fastest growing franchises in 2017. It is a Delaware limited liability company with its corporate headquarters and principal place of business at 7815 Walton Pkwy, New Albany, Ohio 43054.

38.     Red Roof Franchising maintains a registered agent in Ohio, and it can be served through its registered agent, Corporation Service Company, at 3366 Riverside Dr. Suite 103, Upper Arlington, OH 43221.

39.     Red Roof owns, supervises, manages, controls, and/or operates the Red Roof Inn located at Red Roof PLUS+ located at 699 Dibblee Dr, Westbury, New York 11590 ("Westbury Red Roof PLUS" or "branded property").

40.   Red Roof owns, supervises, manages, controls, and/or operates the Red Roof Inn located at Red Roof PLUS+ located at 1960 N. Druid Hills Rd, Atlanta, Georgia 30329 ("Atlanta Red Roof PLUS" or "branded property").

     a.  The Westbury Red Roof PLUS and the Atlanta Red Roof PLUS are Red Roof Inn branded properties.[12]

     b.  Red Roof employees work throughout the Westbury Red Roof PLUS and the Atlanta Red Roof PLUS. Red Roof employees work jobs including front desk

---

[12] *Our Brands*, RED ROOF, https://www.redrooffranchising.com (last visited Jun. 9, 2022); *Red Roof Inn*, RED ROOF, https://www.redrooffranchising.com/red-roof-inn (last visited Jun. 9, 2022).

and housekeeping. Red Roof is the principal with control over nearly every element of operations at the Westbury Red Roof PLUS and the Atlanta Red Roof PLUS. Red Roof is liable, either directly, vicariously, or indirectly through an agency relationship for the acts and/or omissions of the employees at its branded hotels, including the Westbury Red Roof PLUS and the Atlanta Red Roof PLUS where J.T. was trafficked. Red Roof has an actual and apparent agency relationship with the physical property owner of the Westbury Red Roof PLUS and the physical property owner of the Atlanta Red Roof PLUS as to establish vicarious liability.

c.  Red Roof controlled and dictated the actions and inactions of the Westbury Red Roof PLUS through highly specific and detailed brand standards, policies, and procedures.

d.  Red Roof knowingly benefited, or received something of value, from its ventures at the Westbury Red Roof PLUS through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where J.T. was trafficked, as well as maintaining a positive public image for the Red Roof Inn brand. Red Roof also benefited from gathering personal data from the Wi-Fi it provided to customers including J.T. and her trafficker.

e.  Red Roof is subject to the jurisdiction of this Court because its corporate offices are headquartered in this district. In addition, Red Roof regularly conducts business in Ohio, including through the operation of numerous hotels in Ohio,

contracting to supply services in Ohio. Red Roof has derived substantial revenue from services rendered in Ohio.

f.  Whenever reference is made in this Complaint to any act, deed, or conduct of Red Roof, the allegation is that Red Roof engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Red Roof.

41.     Upon information and belief, **Defendant G6 Hospitality, LLC.** ("G6") is a large hotel brand with over 1,400 branded properties worldwide.  It is a Delaware limited liability company with its principal place of business in Carrollton, TX and can be served through its registered agent, Corporation Service Company at 50 W. Broad Street, Suite 1330, Columbus, OH 43215. The company also provides franchise opportunities for its hotel and motel brands through **Defendant G6 Hospitality Franchising, LLC,** ("G6 Hospitality") a for-profit Delaware company with its principal place of business in Carrolton, Texas.  Together G6 and G6 Hospitality will be referred to as "G6 Defendants."

42.     G6 owned, supervised, and/or operated the Motel 6 at 6 US-1, New Brunswick, New Jersey 08901 ("G6's New Brunswick Motel 6" and/or "branded property").

a.  G6's New Brunswick Motel 6 is a G6 brand property.[13]

b.  G6 employees worked throughout G6's New Brunswick Motel 6 G6 employees worked jobs including front desk and housekeeping. G6 is the principal with control over nearly every element of operations at G6's New Brunswick Motel 6. G6 is liable, either directly, vicariously, or indirectly through an agency relationship for acts and/or omissions of the employees at its branded hotels,

---

[13] *Our Brands,* Wyndham Hotels, https://www.wyndhamhotels.com/wyndham-rewards/our-brands (last visited September 27, 2022).

including G6's New Brunswick Motel 6 where J.T. was trafficked. G6 has an actual and apparent agency relationship with the physical property owners of G6's New Brunswick Motel 6 as to establish vicarious liability.

c. G6 controlled and dictated the actions and inactions of G6's New Brunswick Motel 6 through highly specific and detailed brand standards, policies, and procedures.

d. G6 knowingly benefited, or received something of value, from its ventures at G6's New Brunswick Motel 6 through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where J.T. was trafficked, as well as in maintaining a positive public image for G6's New Brunswick Motel 6. G6 also benefited from gathering personal data from the Wi-Fi it provided to customers including J.T. and her trafficker.

e. G6 is subject to the jurisdiction of this Court because it regularly conducts business in Ohio, including through the operation of numerous hotels in Ohio, contracting to supply services in Ohio. G6 has derived substantial revenue from services rendered in Ohio.

f. Whenever reference is made in this Complaint to any act, deed, or conduct of G6, the allegation is that G6 engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of G6.

43. **Defendant Six Continents Hotels Inc.** ("Six Continents") is the ultimate parent

company for a United Kingdom incorporated corporation InterContinental Hotels Group PLC ("IHG") in the United States. IHG manages the brands of approximately 5,600 hotels throughout almost 100 countries.

44.     Defendant Six Continents is responsible for all brand standards for IHG brand hotels in the United States. Defendant Six Continents also owns, operates, or otherwise manages the software program for making reservations at IHG brand hotels. Defendant Six Continents may be served with service of process by serving its registered agent, United Agent Group, Inc. at 119 E. Court Street, Cincinnati, OH 45202.

45.     **Defendant Holiday Hospitality Franchising, LLC** ("Holiday Hospitality") is a wholly owned subsidiary of IHG. It is a Delaware corporation and can be served by its registered agent United Agent Group, Inc. at 119 E. Court Street, Cincinnati, OH 45202.  Together Six Continents, IHG, and Holiday Hospitality will be referred to as the "IHG Defendants.[14]"

46.     The IHG Defendants owned, supervised, and/or operated the Holiday Inn at 1730 N Ocean Ave, Holtsville, New York 11742 ("IHG's Long Island Holiday Inn" or "branded property")

   a.   IHG's Long Island Holiday Inn is an IHG brand property.[15]

   b.   IHG employees work throughout IHG's Long Island Holiday Inn. IHG employees work jobs including front desk and housekeeping. The IHG Defendants are principals with control over nearly every element of operations at IHG's Long Island Holiday Inn. The IHG Defendants are liable, either directly, vicariously, or indirectly through an agency relationship for the acts and/or omissions of the employees at the IHG branded hotels, including IHG's Long Island Holiday Inn

---

[14] These three entities are one and the same for purposes of this lawsuit. Any reference to Six Continents, Holiday Hospitality, and Holiday Hospitality is a reference to all three entities
[15] *Our Brands*, IHG, https://www.ihg.com/content/us/en/about/brands (last visited Jun. 15, 2022).

where J.T. was trafficked. The IHG Defendants have an actual and apparent agency relationship with the physical property owner of IHG's Long Island Holiday Inn as to establish vicarious liability.

c. The IHG Defendants controlled and dictated the actions and inactions of IHG's Long Island Holiday Inn through highly specific and detailed brand standards, policies, and procedures.

d. The IHG Defendants knowingly benefited, or received something of value, from their commercial business ventures at IHG's Long Island Holiday Inn through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where J.T. was trafficked, as well as in maintaining a positive public image for the IHG Holiday Inn brand. The IHG Defendants also benefited from gathering personal data from the Wi-Fi it provided and monitored to customers including J.T. and her trafficker.

e. The IHG Defendants are subject to the jurisdiction of this Court because they regularly conduct business in Ohio, including through the operation of numerous hotels in Ohio, contracting to supply services in Ohio. The IHG Defendants have derived substantial revenue from services rendered in Ohio.

f. Whenever reference is made in this Complaint to any act, deed, or conduct of any one of the IHG Defendants, the allegation is that the IHG Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the

management, direction, control, or transaction of the ordinary business and affairs of the IHG Defendants.

## JURISDICTION AND VENUE

47. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

48. The Court has personal jurisdiction pursuant to the William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA") and 18 U.S.C. § 2255, Child Abuse Victims' Rights Act ("CAVRA").

49. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because the Court has personal jurisdiction over Defendants Choice and Wyndham.

50. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendants Red Roof Inns, Inc. and Red Roof Franchising, LLC have their principal place of business within this District.

51. Pursuant to Southern District of Ohio Local Rule 3.1(b), this case is related to the sex trafficking cases currently pending before Judge Algenon L. Marbley.

## INTRODUCTION

52. J.T. brings her claims against the Hotel Defendants for violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA") 18 U.S.C. § 1595(a) and the Child Abuse Victim's Rights Act ("CAVRA"), 18 U.S.C. § 2255.

53. The TVPRA prohibits Defendants from profiting from any venture they know or should know involves a violation of § 1591, and thereby establishes a non-delegable duty of reasonable care.

54. An overwhelming majority of commercial sex trafficking transactions occur within the hotels and motels, as traffickers use their rooms as the hub for their operations.[16] Hotels offer anonymity and non-traceability, privacy, and discretion, making them ideal venues sex trafficking. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex. In addition, traffickers regularly use Defendants' Wi-Fi to advertise and solicit victims for commercial sex against their will.

55. As part of their conspiracy, to save costs and continually reap millions of dollars in profits, Defendants generally failed to create, adopt, implement, and enforce company-wide policies and procedures regarding suspected incidents of human trafficking at the branded properties. Furthermore, Defendants, did not train staff how to identify and respond to suspected human trafficking, failed to require training of all employees on human trafficking policies and procedures, and failed to conduct audits confirming compliance with policies and procedures.

56. Defendants kept no reports or data on suspected incidences or occurrences of human trafficking on their properties and the rate at which those occurrences changed as a result of implementing human trafficking policies and procedures. Defendants did not establish a mandatory and secure reporting mechanisms at the point of sale.

57. With little to no risk posed to traffickers seeking to use Defendants' rooms as a location to force victims like J.T. to engage in commercial sex against her will, the sex trade continues to thrive at Defendants' branded properties while Defendants reap the benefits.

58. Plaintiff's injuries are indivisible and cannot be separated. Plaintiff's injuries are the result of continued instances of ongoing violent traumatizing sexual exploitation.

59. Defendants are jointly and severally liable for the Plaintiff's damages in this case.

---

[16] Bradley Myles, *Combating Human Trafficking in the Hotel Industry*, HUFFINGTON POST (Jul. 22, 2015), https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_ 7840754.

**THE SEX TRAFFICKING OF PLAINTIFF J.T.**

60. J.T. was kidnapped by her trafficker in 2015 when she was just sixteen (16) years old.

61. By means of a combination of force, coercion, violence, threats, manipulation, compelled use of and dependency on illegal substances, and possessions, and deprivation of basic survival necessities such as, but not limited to, food, water, transportation, shelter, and clothing, J.T. was held captive and sold for sex by her trafficker through the fall of 2016.

62. During the time that she was trafficked, J.T.'s trafficker frequently rented rooms at the Defendants' hotel and motel locations because the rooms provided convenient, anonymous, and relatively central locations for "johns" to pay to engage in sex with J.T.

63. Throughout her trafficking, J.T.'s trafficker connected with "johns" by posting or causing to be posted advertisements on Backpage advertising for J.T.'s availability for commercial sex. J.T.'s 's trafficker posted many of these advertisements and had conversations with "johns" while connected to Defendants' Wi-Fi.

64. J.T. was forced to have sex with multiple "johns" every day she was trafficked in Defendants' hotels.

65. While under the coercive control of trafficker, J.T.'s was imprisoned in hotel rooms rented by her trafficker and forced her to have sex for money. During that time, J.T. was trafficking in the following hotels:

    a. Choice's Rodeway Inn;

    b. Wyndham's Rockville Ramada;

    c. Westbury Red Roof PLUS;

    d. Atlanta Red Roof PLUS;

e. G6's New Brunswick Motel 6; and

f. IHG's Holtsville Holiday Inn

66. J.T. was a child during the time she was trafficked, and her traffickers constantly shuffled her back and forth among hotels, often visiting the same hotels, *i.e.*, Defendants' branded properties, repeatedly at intervals.

67. While at the Defendants' branded properties, J.T.'s trafficker violently attacked and beat her, and psychologically tormented her by withholding food and water, all to ensure that she could not escape. Her status as a child, her deterioration and poor health conditions, her desperation were obvious to anyone who saw her.

68. During her captivity at Defendants' branded properties, J.T. was raped, continuously abused physically and verbally, malnourished, psychologically tormented, kidnapped, and imprisoned.

69. At the above listed hotels, J.T. encountered the same staff on multiple occasions. Defendants' staff would have seen the signs of J.T.'s deterioration brought on by the abuse perpetrated by her traffickers, including bruising and physical and verbal abuse occurring in public areas of Defendants' properties as well as signs of malnutrition and poor health.

70. Every time J.T. interacted with Defendants' staff, it was readily apparent that J.T. was a child under the control of her trafficker or traffickers. J.T.'s traffickers, who were significantly older than J.T., and often checked using their own names.

71. J.T.'s traffickers followed a repetitive and routine procedure during stays at the Defendants' branded properties and Defendants' knew or should have known of J.T.'s trafficking because of a variety of factors detailed below.

72. J.T. was trafficked for sex at Choice's Rodeway Inn.

73. J.T. was sold for sex at Choice's Rodeway Inn between approximately September to December 2015.

74. Upon information and belief, J.T.'s trafficker was on a Do-Not-Rent (DNR) list at Choice's Rodeway Inn, so the trafficker forced J.T. to check in using fake identification. Other times, her trafficker would have another person check-in for them. Even though the staff recognized the trafficker, he was permitted to stay at the hotel.

75. Plaintiff J.T. was subjected to sex trafficking at the Wyndham's Rockville Ramada.

76. Plaintiff was sold for sex at Wyndham's Rockville Ramada from approximately the summer of 2015 to the fall of 2016, occasionally staying for days at a time, within this period.

77. During one stay at the Wyndham's Rockville Ramada, the staff observed a lot of foot traffic of "johns" coming in and out of the hotel room. As a result, the staff placed J.T.'s trafficker on Do-Not-Rent (DNR) list. However, J.T. and her trafficker still returned to Wyndham's Rockville Ramada, and her trafficker another person check in for him.

78. The trafficker was still seen in public areas of the Wyndham Rockville Ramada during the stays when he was on the DNR list.

79. Plaintiff J.T. was subjected to sex trafficking at the Westbury Red Roof PLUS.

80. J.T. was sold for sex at the Westbury Red Roof PLUS from approximately winter 2015/2016 through approximately August 2016.

81. J.T. was subjected to sex trafficking at the Atlanta Red Roof PLUS.

82. J.T. was sold for sex at the Atlanta Red Roof PLUS from approximately June 2015 through approximately October 2015.

83. Plaintiff J.T. was subjected to sex trafficking at G6's New Brunswick Motel 6.

84. J.T. was sold for sex at G6's New Brunswick Motel 6 from approximately June 2015 through approximately October 2015.

85. J.T. recalls the police being called there because of a trafficker who was friends with her trafficker was fighting with the victim. J.T.'s saw the news one night while there that showed her photo as a missing child.

86. Plaintiff J.T. was subjected to sex trafficking at IHG's Holtsville Holiday Inn

87. J.T. was sold for sex at IHG's Holtsville Holiday Inn from approximately September 2015.

88. On one occasion the manager of IHG's Holtsville Holiday Inn came to the door and told the trafficker that the cameras showed many men coming in and out of the room after staying short periods of time. The manager also told the trafficker that he saw on the cameras young girls coming in the side doors. Despite this, the manager allowed them to stay.

89. At all Defendants' branded properties there was constant foot traffic in and out of J.T.'s room. At all hours of the day and the night, the staff witnessed "johns" – who were significantly older than J.T. – come into the main entrance and to J.T.'s room. The staff also had access to security camera footage documenting the constant stream of buyers from cameras placed in throughout the hotel.

90. At all Defendants' branded properties J.T.'s trafficker was very violent with her and loud sounds of abuse and J.T.'s screams for help could often be heard from the room.

91. Each stay at Defendants' branded properties where J.T. was trafficked resulted in several consistent red flags, including, but not limited to: Paying for stays in cash; Paying for extended stays on a day-by-day basis; Obvious signs of illegal drug use; Physical abuse in public

spaces; Unusually large number of male visitors coming in and out of the room; Loud noises of abuse or other emergency audible to staff or other rooms; and Living out of the hotel room.

92.     J.T. was repeatedly raped and otherwise sexually abused hundreds of times at Defendants' branded properties.

93.     The red flags were open and obvious to anyone working at Defendants' branded properties.

## DEFENDANTS' KNOWLEDGE OF SEX TRAFFICKING AT THEIR LOCATIONS

94.     Defendants are aware that the hospitality industry is a major life source of the human trafficking epidemic both in the U.S. and abroad.[17] The United Nations,[18] international non-profits,[19] and the U.S. Department of Homeland Security,[20] have documented this well-known epidemic of human trafficking for years and brought particular attention to the indispensable role of hotels. Defendants cannot help but be aware of the public outcry against human trafficking, especially when so much of the uproar surrounds their industry.

95.     For example, in 2004 End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States, identifying the steps companies would need to take to prevent child sex trafficking. ECPAT-USA

---

[17] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[18] *Global Report on Trafficking in Persons,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (2020), 84 8available at https://www.unodc.org/documents/data-and-analysis/tip/2021/GLOTiP_2020_15jan_web.pdf; See also *We must act together to fight exploitation and human trafficking in tourism, say United Nations and international partners,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (April 24, 2012) available at https://www.unodc.org/unodc/en/press/releases/2012/April/we-must-act-together-to-fight-exploitation-and-human-trafficking-in-tourism-say-united-nations-and-international-partners.html
[19] The Polaris Project and ECPAT-International have published extensive reports and professional toolkits on human trafficking in the hospitality industry for years.
[20] Human Trafficking and the Hospitality Industry, U.S. DEPARTMENT OF HOMELAND SECURITY (2020), available at https://www.dhs.gov/blue-campaign/hospitalityindustry; Hospitality Toolkit, U.S. DEPARTMENT OF HOMELAND SECURITY (2016), available at https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

identified hotel-specific best practices for preventing sex trafficking, such as: (1) not renting by the hour; (2) not permitting cash payments; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number.

96. Further, nationwide campaigns have recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue and took initiative as early as 1997 with the United Nations Blue Heart Campaign[21] and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[22] These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released free online resources and toolkits publicly accessible to any entity concerned with human trafficking.

97. All Defendants, on information and belief, have access to individual hotel location do-not-rent ("DNR") lists that often list reasons for the refusal to rent, including the suspicion of human trafficking. The Defendants nevertheless do not share such information with other hotel locations, thereby preventing other of their hotel locations from acting to protect the victims of such suspected human traffickers.

---

[21] *The Blue Heart Campaign,* UNITED NATIONS (2022), https://www.unodc.org/blueheart/#:~:text=The%20Blue%20Heart%20Campaign,help%20prevent%20this%20heino us%20crime.

[22] *DHS Blue Campaign Five Year Milestone*, DEP'T OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

98. All Defendants also have access to public police reports, news reports and internal reports generated by customers and employees, regarding sex trafficking at their own hotel locations in particular.

99. All Defendants have access to reviews left by guests on websites such as www.tripadvisor.com, www.yelp.com, www.google.com, and others, wherein guests frequently complain about the prevalence of obvious prostitution, hearing physical violence by pimps, and other signs of human trafficking.

100. Each Defendant monitored these complaints and reviews and, upon information and belief, each hired a third party vendor, such as Reputology and/or Medallia, to send reports of all complaints and reviews to the corporate headquarters of each Defendant who either ignored and/or failed to take any action about the complaints about prostitution and/or human trafficking reported to them.

**DEFENDANTS FACILITATED AND HARBORED THE TRAFFICKING OF J.T.**

101. Each Defendant is a signatory of the Code[23] and thereby has promised to adopt these policies to combat trafficking. Yet, Defendants have failed to implement most, if not all these policies, and continue to unlawfully benefit from the trafficking on their properties.

102. Each Defendant is a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and each Defendant publicly committed to participate in the programs own to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, each Defendant not only should have created effective Brand standards for implementation, mandates, and operations, but also enforced them.

---

[23] *See Our Code Members,* ECPAT, https://www.ecpatusa.org/code-members

103. Defendants profited from the sex trafficking of Plaintiff J.T. Defendants rented rooms to and provided Wi-Fi to J.T.'s trafficker when they knew, or should have known, that human trafficking was prevalent within their branded properties and at the specific locations where J.T. was trafficked. The hotel staff, especially front desk staff, at Defendants' branded properties knew or should have known of the obvious signs of J.T.'s trafficking.

104. Defendants benefited from the steady stream of income that J.T.'s trafficker and "johns" bring to their hotel brands. Defendants profited from each and every room that J.T.'s trafficker and customers rented where J.T. was harbored and maintained for the purpose of sex trafficking. In addition, Defendants profited from data collected each and every time J.T.'s trafficker and customers used Defendants' Wi-Fi to advertise and solicit J.T. for commercial sex.

105. Defendants have made a public commitment to combat human trafficking, and thus, are aware that trafficking is a common problem in the hospitality industry. Defendants should have been aware of the benefits they were receiving from the human trafficking occurring at the locations where J.T. was trafficked given Defendants access to information, such as police reports, news articles, complaints, and negative reviews regarding the specific locations and surrounding areas.

106. Moreover, Defendants repeatedly collected data on J.T., her traffickers, and her "johns" from her many stays at Defendants' branded properties, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data. Defendants' employees witnessed the obvious signs of J.T.'s trafficking including signs of abuse, frequent male visitors coming in and out of the room, condoms in the trash, loud yelling and fighting, and others. Despite having access to all this information for years, Defendants failed to take reasonable measures to stop benefitting from sex trafficking occurring in their hotels.

If Defendants would have taken proper measures, behaving as a reasonably diligent corporation, Defendants would not have profited from J.T. and other victims like her being trafficked at their branded locations.

107. Defendants discussed, developed, and implemented uniform policies and procedures to identify, prevent and mitigate the risk of human trafficking occurring at their properties, including the hotels where J.T. was trafficked. Upon information and belief, these policies included ongoing communication with its local hotels by including articles about human trafficking in newsletters, announcements at annual conferences, alerts to hotels in high-risk areas or in proximity to high-risk events, and field-based associates who visit hotels specifically to discuss human and sex trafficking issues.

108. Pursuant to these policies, branded location employees and property management regularly reported customer data and other indicators of trafficking including suspicious criminal activity, web data indicating use of commercial sex websites, and data associated with reservations to the parent corporations of the branded properties. The staff at the properties where J.T. was trafficked and reported this to Defendants or would have if Defendants did not fail to institute reasonable policies and procedures.

109. In addition, Defendants had access to and monitored much of this data through the management of centralized data systems it required the branded properties to use, including but not limited to the property management, booking, credit processing, and information technology and internet systems.

110. Defendants failed to engage in reasonably diligent corporate conduct or take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps

to stop reaping the benefits of sexual exploitation on their properties. Defendants maintained their deficiencies to maximize profits by:

a. Failing to mandate and minimizing costs of training employees and managers on how to spot the signs of human trafficking and sexual exploitation;

b. Lowering operating costs and management costs by failing to analyze the data they received regarding criminal activity and customer reviews that indicated sex trafficking was occurring and taking the steps necessary to remedy the problems;

c. Collecting and utilizing massive amounts of data from all of their branded locations for marketing and other profit-driven purposes but failing to utilize this same data to combat sex trafficking in their hotels;

d. Failing to refuse room rentals, or report guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

e. Failing to monitor and track guest wireless network use for illicit commercial sex purposes or digital activity associated with human trafficking.

f. Failing to institute proper security measures, including, but not limited to, employing qualified security officers or appropriate cybersecurity measures to actively combat human trafficking and sexual exploitation; and

g. Failing to use its power as a parent company hold the franchisees accountable for contributing to the prevalence of sex trafficking on their properties.

111.     As a direct and proximate result of these egregious practices on the part of the Defendants, J.T. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

**DEFENDANTS' CONTROL OVER THEIR BRAND HOTELS**

112.     Upon information and belief, it is a standard practice in the hospitality industry, followed by both Defendants, for parent companies to set exacting brand quality standards reaching everything from the temperature at which coffee shall be served, to the number of pillows that shall be placed on each bed, to the types of funds accepted, to when, where and how guests should be greeted.

113.     Defendants provide their branded properties with signage on and in front of the building intended to assure customers that, if they check into that hotel, they can expect an experience consistent with the standards of the parent hotel brand.  The same brand is emblazoned on everything in the hotel, from the pens on the bedside table to the staff uniforms at the front desk.

114.     Defendants provide their branded properties brand name recognition, a marketing campaign, and hotel listings in the Global Distribution System (GDS) and other online travel agency databases, as well as with access to their brand-wide central reservation systems, 800 numbers, revenue management tools, brand loyalty programs, and company websites.  Thus, booking and room reservations are to a substantial extent controlled by Defendants.[24] Defendants see booking and reservation trends, including for those branded hotels where Plaintiff was trafficked.[25]

---

[24] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (Apr. 10, 2018), https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel- industry/.
[25] Where a branded hotel allows cash to be accepted for payment, monitoring and auditing these trends are important to identifying locations where criminal activity and commercial sex trafficking may be occurring.

115. Upon information and belief, Defendants require its branded hotel properties to use a property management system, which is linked to Defendants' corporate network and data center, for, among other things, receiving reservations, and processing credit card transactions.

116. Upon information and belief, per the relevant franchise agreements,[26] Defendants may enforce their brand standards by means of periodic inspections of their brand hotel locations, backed up with the ultimate threat of termination of the franchise agreement.

**CHOICE**

117. Choice exercises day-to-day control over Choice's Rodeway Inn and its other brand hotels through centralized corporate systems, training, policies, and brand standards. Choice implements and retains brand hotel control over, including control over Choice's Rodeway Inn and, as either direct subsidiaries or under the terms of its franchise agreements.

118. Upon information and belief, Choice controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

    a. Requiring the branded locations to use Choice's property management system;

    b. Gathering reports of data generated by branded locations including reservation, payment, and occupancy information through Choice's centralized systems;

    c. Requiring branded locations to keep audit reports and other records;

    d. Conducting regular inspections for compliance with franchise agreement terms and Choice's rules and regulations;

    e. Providing marketing requirements and standardized marketing services for the branded locations;

---

[26] Most franchise disclosure documents, which outline the policies and procedures of franchise agreements, can be accessed publicly for free by making an account on https://fddexchange.com/view-fdd-docs.

f. Regulating and monitoring the all the policies, procedures, and standards of the branded properties from the front desks to the bathrooms;

g. Requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering and monitoring the branded hotel's compliance;

h. Requiring branded locations to install Choice's data transport system to share data with Choice corporate and monitoring the branded hotel's compliance;

i. Providing training and orientation materials for branded property staff;

j. Requiring branded locations to make modifications to the branded properties upon Choice's request and to refrain from make substantial changes to the branded property without Choice's permission and monitoring the branded property's' compliance;

k. Regulating the rates for room rentals and monitoring compliance; and

l. Insurance coverage requirements and monitoring the requirements.[27]

119.    Choice manages corporate and branded property training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by Choice.[28]

120.    Choice controls and monitors uniform and required reservation, marketing,

---

[27] See e.g. Comfort Inn 2020 Franchise Disclosure Document, https://fddexchange.com/view-fdd-docs/comfort-inn-2020-fdd-franchise-information-costs-and-fees/
[28] *See* e.g. *Why Choice?,* CHOICE, https://choicehotelsdevelopment.com/why-choice (last visited Jun. 9, 2022). id. ("We've taken our teams' collective knowledge of hotel operations, technology, service and leadership, and developed the tools and resources our owners use every day to help run their businesses.").

customer support systems and loyalty programs at its branded hotels through national press releases, newsletters, emails, announcements on Choice's website, and mentions across its corporate media channels.[29]

121.    Choice mandates and monitors usage of a cloud-based centralized property management system called ChoiceADVANTAGE to its branded locations.[30]

122.    Choice controls and monitors all hotel reservations made across its branded locations on its centralized reservation system called Choice Edge.[31]

123.    Through its national sales team, Choice controls and monitors the credit processing system and the centralized direct billing at its brand hotels, including Choice's Rodeway Inn.[32]

124.    Choice gathers data from its customers including names, payment information, reservation history, browsing data, other details associated with their stay for promotional and guest safety reasons.[33]

125.    Upon information and belief, Choice requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place which gives Choice the ability to access, monitor, and harvest that internet data.

126.    Under the guise of maintaining its "brand standards," Choice also forces its branded hotels to frequently undertake expensive renovations, remodeling, and construction efforts, as well as purchase mandated products with limited warranties which are shortened by such onerous and exorbitant requirements.[34]

127.    Choice requires and monitors branded properties' compliance with its corporate

---

[29] *Id.*
[30] *Connect the world through the power of hospitality*, CHOICE, https://www.choicehotels.com/about
[31]  *Supra* n 101
[32] *Id.*
[33] Choice Hotels International, Inc. *Privacy & Security Policy,* https://www.choicehotels.com/legal/privacy-policy
[34] *See e.g.*, *Convert an Existing Hotel*, CHOICE HOTELS, https://choicehotelsdevelopment.com/ convert-a-hotel/#upscale (last visited Jun. 9, 2022).

policies relating to Security and Guest Safety, Human Rights, Ethics, Corporate Governance, and compliance with the law.[35]

## WYNDHAM

128. Wyndham exercises day-to-day control over Wyndham's Rockville Ramada Wyndham's North Carolina Days Inn and its other brand hotels through centralized corporate systems, training, policies, and brand standards. Wyndham implements and retains brand hotel control over, including control over Wyndham's Rockville Ramada was trafficked, as either direct subsidiaries or under the terms of its franchise agreements and monitors this compliance.

129. Upon information and belief, Wyndham controls and monitors the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

    a. Requiring the branded locations to use Wyndham's property management system and monitoring compliance;

    b. Requiring branded locations to keep audit reports and other records and monitoring compliance;

    c. Conducting regular inspections, quality assurance evaluation reports, and audits for compliance with franchise agreement terms and Wyndham's corporate policies;

    d. Gathering reports of data generated by branded locations including reservation, payment, and occupancy information through Wyndham's centralized systems;

    e. Requiring the brands to regularly report data regarding customer feedback to

---

[35] Choice claims to "strive to conduct [its] business operations free from violations of human rights" *See Human Rights Policy*, CHOICE HOTELS, https://www.choicehotels.com/about/responsibility/human-rights-policy (last visited Jun. 6, 2022).

Wyndham and monitoring compliance;

f. Providing marketing requirements and standardized marketing services for the branded locations and monitoring compliance;

g. Regulating the all the policies, procedures, and standards of the branded properties from the front desks to the bathrooms and monitoring compliance;

h. Requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access, security, filtering and monitoring compliance;

i. Providing training and orientation materials for branded property staff;

j. Requiring branded locations to make modifications to the branded properties upon Wyndham's request and to refrain from make substantial changes to the branded property without Wyndham's permission;

k. Requiring branded properties to comply with Wyndham's Human Rights Policy and other laws;

l. Regulating the rates for room rentals and monitoring compliance; and

m. Insurance coverage requirements and monitoring compliance.[36]

130. Wyndham manages corporate and branded property training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by Wyndham.[37]

131. Wyndham controls and monitors uniform and required reservation, marketing,

---

[36] *See e.g.* 2014 Franchise Disclosure Document https://fddexchange.com/wp-content/uploads/2014/03/Days-Inn-Franchise-Disclosure-Document-FDD-July-12-2012.pdf

[37] *Our Brands*, WYNDHAM HOTELS, https://www.wyndhamhotels.com/wyndham-rewards/our-brands (last visited Jun. 15 2022).

customer support systems and royalty programs at its branded hotels through national press releases, newsletters, emails, announcements on Wyndham's website, and mentions across its corporate media channels.[38]

132. Through its national sales team, Wyndham controls the credit processing system and the centralized direct billing at its brand hotels, including the Wyndham's Rockville Ramada where J.T. was trafficked.[39]

133. Wyndham mandates branded properties source through Wyndham's global distribution system.[40] Wyndham mandates the use of specific vendors and suppliers for the purchase of goods and services at its brand hotels, including Wyndham's Rockville Ramada where J.T. was trafficked.[41]

134. Wyndham regulates and monitors property rate, inventory availability, and overall revenue management for the branded locations by monitoring hotel booking data for trends and patterns.[42]

135. Wyndham manages and monitors its branded properties through its Oracle Hospitality OPERA Cloud Property Management System.[43] Wyndham's Development and Sourcing teams negotiate contracts on behalf of brands for hotel infrastructure, operating supplies and equipment and food and beverage.[44]

---

[38] *Benefits of Partnering with Wyndham Hotels & Resorts,* WYNDHAM HOTELS, CHOICE, https://development.wyndhamhotels.com/the-wyndham-advantage/ (last visited Jun. 15, 2022).
[39] *Id.*
[40] *Benefits of Partnering with Wyndham,* WYNDHAM, https://development.wyndhamhotels.com/the-wyndham-advantage/ (last visited Jun. 20, 2022).
[41] *See e.g., id* ("[Our goal is to ensure the design and construction of your hotel is as seamless as possible, guided by the appropriate brand standards.")
[42] Id.
[43] *Wyndham Implements Oracle Hospitality OPERA Cloud Property Management in its Full-Service Hotels,* HOTEL TECHNOLOGY NEWS (May 18, 2021), https://hoteltechnologynews.com/2021/05/wyndham-implements-oracle-hospitality-opera-cloud-property-management-in-its-full-service-hotels/
[44] *Supra* n 103

136.     Wyndham sets, controls, and monitors Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at its brand hotels, including Wyndham's Rockville Ramada and Wyndham's North Caolina Days Inn where J.T. was trafficked.[45]

137.     Wyndham is the employer of the staff at its branded properties. For example, Wyndham posts all hotel jobs on its parent website.[46] Wyndham is also responsible for setting the core values and culture for all Wyndham employees.[47] In addition, Wyndham sets forth policies for, and provides employee benefits.[48]

138.     Wyndham first adopted a Human Rights Statement in 2007. According to the updated 2018 policy, Wyndham promises to comply with human rights laws and standards and has "accountability mechanisms" in place to monitor and report on compliance. Brand locations are required to comply with human rights and "operating standards." Failure to comply can result in the termination of the franchise agreement.[49] Wyndham monitors its properties but fails to assess, train, and address human rights violations.

### RED ROOF

139.     Red Roof exercises day-to-day control over the Westbury Red Roof PLUS and its

---

[45] *Leveraging technology to deliver an exceptional guest experience,* WYNDHAM (Summer 2021) 4, https://developmentsupport.wyndham.com/files/8516/2869/4484/Tech-Guide-Q3-2021.pdf
[46] *Join the Wyndham Family,* WYNDHAM, https://careers.wyndhamhotels.com/ (last visited Jun. 22, 2022)
[47] *About Wyndham,* WYNDHAM, https://careers.wyndhamhotels.com/content/About-Wyndham/#culture (last visited Jun 22, 2022)
[48] *Our Benefits,* WYNDHAM, https://careers.wyndhamhotels.com/content/Our-Benefits/?locale=en_US (last visited Jun 22, 2022)
[49] *Human Rights Statement*, http://q4live.s22.clientfiles.s3-website-us-east-1.amazonaws.com/153757806/files/doc_downloads/governance_documents/Wyndham-Hotel-Resorts-Human-Rights-Policy-Statement.pdf (last visited Jun. 15, 2022).

other brand hotels through centralized corporate systems, training, policies, and brand standards. Red Roof implements and retains brand hotel control, including control over the Westbury Red Roof PLUS, as either direct subsidiaries or under the terms of its franchise agreements.

140. Red Roof controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts and monitors compliance, including but not limited to:

a. Providing the software, hardware, and platforms where data and information is shared with Red Roof corporate and monitors compliance;

b. Providing reservation platforms where payment modes and suspicious reservations would suggest trafficking and monitors compliance;

c. Providing training and education to branded hotels through webinars, seminars, conferences, and online portals;

d. Providing and controlling customer review and response platforms and monitors compliance;

e. Monitoring customer reviews and response platforms;

f. Hosting and monitoring online bookings on Red Roof's domain;

g. Requiring the use of Red Roof's online bookings ;

h. Monitoring online bookings;

i. Requiring branded hotels to use Red Roof's customer rewards program;

j. Monitoring branded hotels to use Red Roof's customer rewards program;

k. Requiring branded hotels to use Red Roof's property management software;

l. Requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

m. Providing IT support for all property management systems, owned, operated, and required by Red Roof;

n. setting employee wages;

o. sharing profits;

p. standardizing training methods for employees;

q. building and maintaining the facility in a manner specified by the owner;

r. standardized or strict rules of operation;

s. regular inspection of the facility and operation by owner; and

t. fixing prices.[50]

141.    Red Roof manages and monitors compliance of corporate training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by Red Roof.[51]

142.    Red Roof controls and monitors compliance of uniform and required reservation, marketing, customer support systems and loyalty programs at its brand hotels, including the Westbury Red Roof PLUS and the Atlanta Red Roof PLUS.[52] Red Roof also advertises its brand hotels through national press releases, newsletters, emails, announcements on redroof.com, and mentions across its corporate media channels.[53]

---

[50] *See* 2021 Franchisee Disclosure Document, https://franchimp.com/?page=pdf&f=105990_2021.pdf
[51] *See e.g.*, *Brand Support*, RED ROOF, https://www.redrooffranchising.com/brand-support (last visited Jun. 9, 2022) ("We support our franchisees with extensive on-site training.  On everything from  helping  with  pricing strategy and operational expense management, to assistance with marketing and operation programs…Our cost-effective sourcing solutions, efficient technology support, and incredible property management system add even more value to your Red Roof franchise.")
[52] *Id.*
[53] *Brand Marketing*, RED ROOF, https://www.redrooffranchising.com/brand-marketing (last visited Jun. 9, 2022) ("From your grand opening to being fully operational, our team helps you market your property every step of the

143.     Red Roof requires its hotels to use a consolidated IT system and database for property management, credit processing and centralized billing, as well as problem-tracking to ensure all problems are resolved promptly and that emergencies are escalated and monitors compliance. [54]

144.     Red Roof boasts of its "Streamlined Technology" and "Shared Success" with its brand hotels. To "make operations as easy and seamless as possible," Red Roof controls "a fully integrated database" which its brand hotels must use to access customer data and reservations, among other information shared system-wide between Red Roof and its brand hotels.[55] Red Roof's privacy policy states that it collects information such as contact information, demographics, financial information, government-issued identification numbers, accommodation preferences, location, IP addresses, and social media content from hotel guests.[56] Red Roof monitors this technology.

145.     Red Roof also sets, controls, and monitors Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at its brand hotels, including the Westbury Red Roof PLUS and the Atlanta Red Roof PLUS.[57]

146.     In addition, through an integrated corporate marketplace, Red Roof mandates the

way. We provide property-specific design services for print materials—like flyers and rack cards—and even help with billboards, transit advertising, and other local promotional needs.")

[54] *See* Red Roof Franchising, available at https://www.redrooffranchising.com/technology; *See also Sales Team,* RED ROOF, https://www.redrooffranchising.com/sales-team (last visited Jun. 9, 27 2022) (corporate Red Roof employees provide brand staff with "regional events, webinars, and in-person visits" alongside training, other support, and "RediBill® Brand-Wide Direct Billing" centralized billing program).

[55] *Technology*, RED ROOF, https://www.redrooffranchising.com/technology (last visited Jun. 9, 2022); see also *Privacy Policy*, RED ROOF, https://www.redroof.com/privacy-policy (last visited Jun. 9, 2022).

[56] *Id.*

[57] *See* sigmawifi Red Roof Inn Case Study, *available at* https://www.sigmawifi.com/red-roof-inn-nh-case-study/

use of specific vendors and suppliers for the purchase of goods and services at its brand hotels, including the Westbury Red Roof PLUS and monitors compliance.[58]

147. Under the guise of maintaining its "brand standards," Red Roof forces its brand hotels to frequently undertake expensive renovations, remodeling, and construction efforts, as well as purchase mandated products with limited warranties which are shortened by such onerous and exorbitant requirements.[59]

148. Red Roof posts job openings for its branded properties on its central career positing website.[60] Red Roof provides benefits to employees of its branded properties, and upon information and belief controls the terms and conditions of their employment.[61]

## IHG

149. IHG, exercise day-to-day control over IHG's Holtsville Holiday Inn and its other brand hotels through centralized corporate systems, training, policies, and brand standards. IHG implement and retain brand hotel control, including control over IHG's Holtsville Holiday Inn as either direct subsidiaries or under the terms of its franchise agreements.

150. Upon information and belief, IHG controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

    a. Providing the software, hardware, and platforms where data and information is shared with IHG and IHG Defendants' corporate;

    b. Providing reservation and booking platforms where payment modes and

---

[58] See *Operational Support Procurement Services*, RED ROOF, https://www.redrooffranchising. com/operational-support (last visited Jun. 6, 2022).
[59] *See Design and Construction,* RED ROOF, https://www.redrooffranchising.com/design-and-constuction (last visited Jun. 9, 2022).
[60] *See* https://www.redroofjobs.com/
[61] *Id.*

42

suspicious reservations would suggest trafficking;

c. Providing and controlling customer review and response platforms;

d. Providing training and education to branded hotels through webinars, seminars, conferences, and online portals;

e. Requiring branded locations to use IHG's vendors for marketing and advertising;

f. Restricting what the branded location is able to sell or services it is able to offer;

g. Requiring branded locations to source hotel infrastructure, furniture, food and beverage and other products from IHG approved suppliers;

h. Requiring branded hotels to use IHG's customer rewards program;

i. Requiring branded hotels to use IHG's property management software;

j. Requiring branded hotels to use certain vendors for internet services, cybersecurity, virtual data management, or other requirements for Wi-Fi access and filtering;

k. Providing IT support for all property management systems;

l. Setting employee wages;

m. Sharing profits;

n. Standardizing training methods for employees;

o. Building and maintaining the facility in a manner specified by the owner;

p. Conducting regular inspections and audits of the facility and operation by owner; and

q. Fixing prices.[62]

151. IHG jointly employs all staff located at IHG's Holtsville Holiday Inn where J.T.was trafficked.

152. IHG Defendants manage corporate training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by IHG.[63]

153. IHG controls uniform and required reservation, marketing, customer support systems and loyalty programs at its brand hotels, including IHG's Holtsville Holiday Inn.[64]

154. IHG collect data from branded properties regarding customers who stay at IHG's locations, interact with their websites, and rewards program members. IHG's Privacy Statement says it collects information such as contact information, demographics, financial information, government-issued identification numbers, accommodation preferences, location, IP addresses, and social media content from hotel guests and website users.[65]

155. IHG mandate that the design of the branded property complies with IHG's brand standards and requires branded locations to source from IHG approved vendors.[66]

156. IHG team of corporate sales professionals oversee business development and

[62] *See e.g.* Crowne Plaza 2016 Franchise Disclosure Document, https://fddexchange.com/view-fdd-docs/crowne-plaza-hotels-resorts-2016-fdd-summary/

[63] *See e.g.*, *Brand Support*, RED ROOF, https://www.redrooffranchising.com/brand-support (last visited Jun. 9, 2022) ("We support our franchisees with extensive on-site training. On everything from helping with pricing strategy and operational expense management, to assistance with marketing and operation programs…Our cost-effective sourcing solutions, efficient technology support, and incredible property management system add even more value to your Red Roof franchise.")

[64] *Support for Owners,* IHG Hotel Development, https://development.ihg.com/en/americas/home/develop-a-hotel/support-for-owners (last visited Jun. 22, 2022)

[65] *Privacy Statement,* IHG, https://www.ihg.com/content/us/en/customer-care/privacy_statement (last visited June 22, 2022)

[66] *Supra* n 112.

revenue generation and manage business-to-business relationships for the branded properties.[67]

157.    IHG require branded properties to use IHG's corporate marketing and advertising resources and materials including online print, televisions, and high-profile sports and event sponsorships.[68]

158.    IHG requires branded properties to use IHG's centralized multi-channel reservation platform.[69]

159.    Through IHG corporate revenue management team fixes the prices of room rentals at the branded properties to maximize profits, as well as make recommendations to brands to maximize revenues.[70]

160.    IHG require branded properties to use a IHG's centralized corporate property management and operations system called FPS Leads.[71]

161.    IHG control and provide centralized technology systems for hotel operations at its brand hotels, including systems its brand hotels must use to access shared customer data and reservations information. Wyndham also sets and controls Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at its brand hotels, including the Crowne Plaza.[72]

162.    IHG post job openings for its branded properties on its central career positing

---

[67] *Id.*

[68] *Id.*
[69] *Id.*
[70] *Id*.
[71] *Id.*
[72] *Id.*

website "careers.ihg.com."[73] IHG provide benefits to employees of its branded properties, and upon information and belief control the terms and conditions of their employment.[74]

163.    IHG requires branded properties to comply with its corporate policies relating to Security and Guest Safety, Human Rights, Codes of Conduct, Corporate Governance, UN Global Compact commitments, and compliance with the law.[75]

**G6**

164.    G6 exercises day-to-day control over G6's New Brunswick Motel 6 and its other brand hotels through centralized corporate systems, training, policies, and brand standards. G6 implements and retains brand hotel control over, including control over G6's New Brunswick Motel 6, as either direct subsidiaries or under the terms of its franchise agreements.

165.    Upon information and belief, G6 controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

   a. Requiring the branded locations to use G6's centralized property management, data management, and reservation and billing systems;

   b. Gathering reports of data generated by branded locations including guest information, reservation, payment, and occupancy information through G6's centralized systems;

   c. Conducting regular quality assurance inspections and audits for compliance with franchise agreement terms and G6's rules and regulations;

   d. Requiring brands to purchase products through G6's e-procurement marketplace system

[73] *Join our extraordinary world,* IHG, https://careers.ihg.com/en/ (last visited Jun. 22, 2022)
[74] Matt Lennon, *IHG revamps staff benefits to boost talent attraction and retention,* Hotel Management (Sept. 21, 2022) https://www.hotelmanagement.com.au/2021/09/21/ihg-revamps-staff-benefits-to-boost-talent-retention/
[75] *Policies,* IHG, https://www.ihgplc.com/en/responsible-business/policies#:~:text=At%20IHG%2C%20we%20are%20committed,processes%20to%20uphold%20our%20commitment. (last visited Jun. 22, 2022)

or from approved suppliers;

e. Requiring branded properties to pay fees based of the percentage of gross room revenues;

f. Providing advertising requirements and standardized marketing services for the branded locations;

g. Requiring branded hotels to use approved vendors for internet services or other requirements for cybersecurity and technology;

h. Requiring all fixtures, furnishings, equipment, signs, services, materials, and supplies to meet G6's strict standards and specifications;

i. Regulating employment policies at branded location including training and orientation materials for staff;

j. Requiring branded locations to make modifications to the branded properties upon G6's request and to refrain from make substantial changes to the branded property without G6's permission;

k. Regulating the rates for room rentals; and

l. Insurance coverage requirements.[76]

166. G6 jointly employs all staff located G6's New Brunswick Motel 6 the Motel 6 by G6 where J.T. was trafficked.

167. G6 manages corporate and branded property training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by

---

[76] *See e.g.* 2017 Motel 6 Franchise Disclosure Document, https://fddexchange.com/view-fdd-docs/motel-6-2017-fdd-summary/motel-6-2017-fdd/

G6.

168.    G6 controls uniform and required reservation, marketing, customer support systems and loyalty programs at its branded hotels through national press releases, newsletters, emails, announcements on G6's website, and mentions across its corporate media channels.[77]

169.    G6 requires branded properties to use a centralized, cloud-based reservation and property management system.[78]

170.    G6 gathers data from its customers including names, payment information, reservation history, browsing data, other details associated with their stay for promotional and guest safety reasons.[79]

171.    G6 requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place which gives G6 the ability to access, monitor, and harvest that internet data.[80]

172.    G6 requires branded properties to comply with its corporate policies relating to Safety and Security, Codes of Conduct, Ethics, Economic, Social, Governance, and compliance with the law.[81]

### TOLLING OF LIMITATIONS

173.    To the extent that Defendants assert an affirmative defense of limitations, Plaintiff invokes the discovery rule. At the time she was harmed and through the end of her trafficking, she was under the coercion and control of her traffickers who drugged her, threatened her, psychologically abused her, exercised coercive control over her, and severely restricted her freedom.  As a result, Plaintiff lacked

---

[77] G6 offers a centralized reservations system on its website, a customer support channel, and press releases and announcements about the Motel 6 brand through g6hospitality.com; G6 also offers a reward program specific to the Motel 6 brand. *See Join My6,* MOTEL 6, https://www.motel6.com/en/home/my6/join.html

[78] *See* Michal Christine Escobar, *2020 Enterprise Innovator: Motel 6,* HOSPITALITY TECHNOLOGY, https://hospitalitytech.com/2020-enterprise-innovator-motel-6

[79] G6 Hospitality. *Privacy Policy,* https://www.motel6.com/en/home/policies/privacy-policy.html

[80] Motel 6, *Web and Mobile Ethical Vulnerability Disclosure Policy,* https://www.motel6.com/en/home/policies/vulnerability-disclosure.html

[81] *Combatting Human Trafficking,* G6 HOSPITALITY, https://g6hospitality.com/about-us/combating-human-trafficking/

the information and capacity to understand her injuries and their legal causes.

174. At the time Plaintiff was harmed, she did not know that she was the victim of human trafficking as that term is defined by law, that her injury arose from being "trafficked" at Defendants' hotels or that she was a person "trafficked," much less that she was the "victim" of a legal venture involving defendants, and she did not discover and was not in a position to discover the legal cause of her injury, more than ten years before suit was filed.

175. To the extent Defendants assert an affirmative defense of limitations, Plaintiff invokes the doctrine of equitable tolling because, as a result of being a victim of trafficking, Plaintiff faced extraordinary circumstances, which arose through no fault of her own, that prevented her from filing a lawsuit, and those circumstances did not end more than 10 years before Plaintiff filed this lawsuit.

176. While under the control of her traffickers through at least the winter of 2016, JT did not have the freedom to investigate her claims, to identify those responsible, or to seek legal representation necessary to pursue her legal rights. Plaintiff could not have pursued her claims while under the active control of her traffickers despite the exercise of ordinary diligence.

177. To the extent Defendants assert an affirmative defense of limitations, Plaintiff also invokes the continuing violation doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct by Defendants, individually and in concert, across the subject locations.

178. JT was subject to continuous trafficking at the subject Motel 6s through at least winter of 2016, which is not more than 10 years before JT filed this lawsuit.

179. This continuous trafficking resulted from Defendants' facilitation of trafficking at the subject properties and Defendants' ongoing ventures with one another and with criminal traffickers at those hotel/motel properties.

### CAUSES OF ACTION

### COUNT 1: 18 U.S.C. § 1595 ("TVPRA")
### (AGAINST ALL DEFENDANTS)

180. Plaintiff incorporates each foregoing allegation.

181. Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is entitled to bring a civil action under 18 U.S.C. §1595.

182. Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595. Specifically, Defendants had a statutory obligation not to benefit financially or receive anything of value from a venture that they knew, or should have known, engaged in violating the TVPRA. At all relevant times, Defendants breached this duty by facilitating violations of the TVPRA through their participation in the harboring, maintaining, soliciting, and advertising of Plaintiff and her trafficker for the purposes of commercial sex induced by force, fraud, or coercion.

183. Defendants have benefited as a result of these acts, omissions, and/or commissions by renting rooms and providing Wi-Fi to traffickers and customers, keeping operating costs low, maintaining the loyal customer base that fuels the supply and demand of sex trafficking, and limiting mandatory regulations. Moreover, on each occasion they received payment for rooms or received payments or kickbacks for internet usage, Defendants directly benefitted from the sex trafficking of Plaintiff when they knew or should have known violations of §1591(a) were occurring. The actions, omissions, and/or commissions alleged in this pleading were the "but for" and proximate cause of Plaintiff's injuries and damages.

184. Plaintiff has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Defendants' hotels and properties.

**COUNT 2: 18 U.S.C. § 2255(A) CHILD ABUSE VICTIMS RIGHTS ACT ("CAVRA")**
**(AGAINST ALL CHOICE AND WYNDHAM)**

185. Plaintiff incorporates each forgoing allegation.

186. Plaintiff was a "minor" pursuant to 18 U.S.C. § 2255(a) when she was trafficked.

187. Plaintiff was the "victim" of violations of 18 U.S.C. §§ 1589, 1590, and 1591.

188.     Plaintiff suffered "personal injury" pursuant to 18 U.S.C. § 2255(a) as a result of those violations.

189.     Plaintiff was a "person" who "has not attained the age of 18 years" pursuant to 18 U.S.C. § 1591(a)(2).

190.     Defendants knew or should have known that means of force, threats of force, fraud, coercion, or any combination of those means would be used to cause Plaintiff to engage in a commercial sex act, pursuant to 18 U.S.C. § 1591(a)(2).

191.     Defendants knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and/or solicited Plaintiff, pursuant to 18 U.S.C. 1591(a)(1), by providing her and her trafficker rooms in hotels and Wi-Fi used advertise Plaintiff and solicit customers affecting interstate commerce where authorities were unlikely to discover the injuries being sustained by Plaintiff.

192.     Defendants knowingly benefited, financially or by receiving anything of value, from participation in ventures of renting rooms and providing Wi-Fi that recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and/or solicited Plaintiff to engage in commercial sex acts.

193.     Defendants engaged in a conspiracy to ignore and actively refrain from engaging in any conduct that would prevent them from profiting from sex trafficking at their branded properties.

194.     Wherefore, by reason of the foregoing, Defendants are jointly and severally liable to Plaintiff for compensatory damages and for punitive damages, in the amount to be determined at trial, together with interest and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment as follows:

a. Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

b. Disgorgement of profits obtained through unjust enrichment;

c. Restitution;

d. Statutory and/or treble damages, where available;

e. Punitive damages;

f. Attorneys' fees and expenses;

g. The costs of this action;

h. Pre- and post-judgment interest; and

i. Any other relief the Court or jury deems appropriate.

## <u>JURY DEMAND</u>

Plaintiff hereby demands a trial by jury.

Dated: April 28, 2025        Respectfully submitted,

<u>*/s/ Steven C. Babin, Jr.*</u>
Steven C. Babin, Jr. (0093584)
Penny L. Barrick (0074110)
**Babin Law, LLC**
10 West Broad Street, Suite 900
Columbus, Ohio 43215
T: 614-761-8800
C: 614-747-6184
E: steven.babin@babinlaws.com
penny.barrick@babinlaws.com